OPINION
{¶ 1} Defendant-appellant, Woodrow Wilson III, appeals his convictions and sentences on three counts of aggravated robbery with firearm specifications following a jury trial in the Clermont County Court of Common Pleas.
 {¶ 2} Late afternoon on August 14, 2000, Ronald Strunk was working at the Subway restaurant on Eastgate South Drive in Union Township, Clermont County ("Eastgate Subway") when a white male wearing a black knit hat pulled low over his eyebrows and an untucked tee shirt walked in. Strunk recognized the individual as someone who had been in the restaurant earlier that day. The man handed Strunk a brown paper bag and a note which read in part "this is a robbery," then stated "you know what to do." The man also lifted his tee shirt to display the black handle of a silver semi-automatic gun which was tucked in his waistband. Strunk took the paper bag, put $250 from the cash register into the bag, and handed the bag back to the individual, who then casually left the restaurant. The entire robbery lasted 30 to 45 seconds. Later that day, Strunk met with Detective John Lucas of the Union Township Police Department to prepare a composite of the robber.
 {¶ 3} A few days later, Strunk was with a friend in the parking lot of a pizzeria in nearby Mt. Carmel when he noticed a man "look[ing] just dead-on" like the individual who had robbed the Eastgate Subway. The individual and two other persons got into a 1994 purple Chevrolet Cavalier and drove off. Strunk and his friend followed them to an apartment complex in Mt. Carmel where they lost track of them. Strunk provided the police with the description and the license plate number of the Cavalier.
 {¶ 4} On August 16, 2002, a few minutes before the store's 8:00 p.m. closing time, Barbara Jarvis was working alone at the Wonder Hostess store on State Route 28 in Miami Township, Clermont County when she noticed a white male wearing a black knit toboggan hat pulled down over his ears milling around the store. The man was also wearing a tee shirt and a pair of shorts. The hat made Jarvis leery of the man, but she convinced herself that the man possibly had cancer. Around closing time, as the man was lingering in the store, Jarvis turned off some lights and started sweeping the rugs. Eventually, the man asked her which register was open. Jarvis directed him to a register, walked around him to get to the register, and rung up a box of cereal the man had. As Jarvis turned to tell the man how much he owed, the man lifted his tee shirt to display the black handle of a semi-automatic gun which was tucked in his waistband. At the same time, the man handed Jarvis a brown paper bag and said "you know what to do with this, don't you?" Jarvis opened the cash register, put over $700 from the cash register into the bag, and handed the bag back to the individual. The man started walking towards the doors, turned around, reached for the box of cereal, and warned Jarvis not to call anyone for one to two minutes. He then left the store. Detective Matthew Davis of the Miami Township Police Department responded to the scene. Later that evening, he and Jarvis prepared a composite of the robber.
 {¶ 5} On the afternoon of August 22, 2000, Angela Herlinger was working at the Futon store in Eastgate, two doors away from the Eastgate Subway. Herlinger was daydreaming at the store counter, which was 40 feet from the store's glass windows, when she noticed a white male walking past the Futon store in the direction of the Eastgate Subway. This particular individual attracted Herlinger's attention because she thought at first he was a high school acquaintance. It took 30 to 40 seconds for the individual to walk from one end of the Futon store to the other hand. In his hand was a small black item which was consistent with the size and shape of a winter knit hat.
 {¶ 6} That same afternoon, Diane Jones was working at the Eastgate Subway when a white male wearing a black winter hat and an untucked tee shirt walked in. Jones approached the counter to take the man's order. On the counter was a brown paper bag. The man took a step back, lifted his tee shirt to display the black handle of a gun which was tucked into his waistband, and said "now you know what to do with the bag." Jones went to the cash register, put about $140 from the cash register into the bag, and handed the bag back to the individual, who then "strolled out" of the restaurant. The entire robbery lasted approximately one minute. Jones later met with Det. Lucas to prepare a composite of the robber.
 {¶ 7} During his investigation, Det. Lucas learned that the Cavalier was owned and driven by a Clifford Rose, who liked to "hang out" with an individual named Shane Davidson and appellant. Several photographic arrays, including one with a picture of Rose and one with a picture of Davidson, were shown to Strunk and Jones. Neither one identified the robber in those arrays. Two photographic arrays with a picture of appellant were eventually shown to Strunk and Jones. Each clerk separately identified appellant as the robber in both arrays. In November 2000, Jarvis, Jones, and Herlinger viewed a lineup composed of appellant and five inmates. All six men were dressed in jail garb. All three women separately identified appellant as the robber.
 {¶ 8} Appellant was indicted on three counts of aggravated robbery in violation of R.C. 2911.01(A)(1) with firearm specifications in violation of R.C. 2941.145(A). On June 29, 2001, a jury found appellant guilty as charged. Following a sentencing hearing, appellant was sentenced to three consecutive seven-year prison terms for the aggravated robberies and three consecutive three-year prison terms for the firearm specifications, for a total stated prison term of 30 years. Appellant now appeals and raises nine assignments of error which will be considered out of order.
 {¶ 9} Assignment of Error No. 2:
 {¶ 10} "THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT IN OVERRULING HIS MOTION TO SUPPRESS IDENTIFICATION, IN VIOLATION OF APPELLANT'S RIGHT TO DUE PROCESS OF LAW UNDER THE 14TH AMENDMENT TO THE U.S. CONSTITUTION, AND ART. I. § 16 OF THE OHIO CONSTITUTION."
 {¶ 11} Upon being presented with two photographic arrays which included appellant's picture, Strunk and Jones both identified appellant as the robber. Likewise, upon viewing a lineup composed of appellant and five other persons, Herlinger, Jones, and Jarvis identified appellant as the robber. Appellant moved to have this identification suppressed, arguing that the procedure used for the arrays and the lineup was unduly suggestive. The trial court denied the motion. On appeal, appellant contends that the identification from the arrays and the lineup was so suggestive that it should have been suppressed.
 {¶ 12} An appellate court may not disturb a trial court's decision on a motion to suppress where it is supported by competent, credible evidence. State v. Retherford (1994), 93 Ohio App.3d 586, 592. When considering a motion to suppress, the trial court serves as the trier of fact and is the primary judge of the credibility of witnesses and the weight of the evidence. State v. Fanning (1982), 1 Ohio St.3d 19, 20. Relying on the trial court's findings, the appellate court determines "without deference to the trial court, whether the court has applied the appropriate legal standard." State v. Anderson (1995), 100 Ohio App.3d 688,691.
 {¶ 13} Courts apply a two-step test when determining the admissibility of challenged identification testimony. First, the defendant must show that the pretrial identification procedure was unduly suggestive. If the defendant meets this burden, the court must then consider whether the procedure was so unduly suggestive as to give rise to irreparable mistaken identification. See Manson v. Brathwaite
(1977), 432 U.S. 98, 97 S.Ct. 2243. Suggestiveness depends on several factors, including the size of the array, its manner of presentation, and its contents. Reese v. Fulcomer (C.A.3, 1991), 946 F.2d 247, 260.
 {¶ 14} With regard to photographic arrays, the test is "whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the photographs as to suggest to an identifying witness that [that person] was more likely to be the culprit." Jarrettv. Headley (C.A.2, 1986), 802 F.2d 34, 41 (brackets in original). It is not a requirement that all pictures in a photographic array be of the same type. State v. Green (1990), 67 Ohio App.3d 72, 79.
 {¶ 15} Appellant first challenges his identification from the photographic arrays. Appellant contends that his picture was "highlighted" in that (1) his picture was the only picture taken in an outside setting, and (2) "before [his] photo was added to the array, the very same array (with someone else's photo substituted for [a]ppellant) had been previously shown to the witnesses, and the witnesses had indicated that the robber was not among the photos."
 {¶ 16} A hearing on appellant's motion to suppress revealed that Strunk was shown seven arrays while Jones was shown six arrays (she was not shown the fifth array). All seven arrays consisted of photographs of six white males. The first five arrays did not include a picture of appellant and neither Strunk nor Jones identified the robber in those arrays. Then, Det. Lucas showed both Strunk and Jones a photographic array (exhibit 6) with a picture of appellant. Both witnesses separately identified appellant as the robber. Jones told the detective that she was 70% certain that appellant was the robber but that she wanted to see appellant in person. Det. Lucas did not tell Jones whether she had correctly identified appellant as the robber. Strunk told the detective he was 90% certain that appellant was the robber but wanted to see a more recent picture of appellant. Both Strunk and Jones testified that they were not coaxed into selecting appellant's picture.
 {¶ 17} Thereafter, Det. Lucas showed both Strunk and Jones another photographic array (exhibit 7) with a more recent picture of appellant. Except for appellant's picture, all the pictures in exhibit 7 were the same pictures that were in exhibit 6. In addition, except for appellant's picture and another picture which were switched, the pictures in exhibit 7 were in the exact same order as in exhibit 6. Appellant's picture was the only picture taken in an outside setting. Again, both Strunk and Jones identified appellant as the robber. Jones told the detective that she was 75% certain that appellant was the robber. She later identified appellant in the lineup. Strunk positively identified appellant as the robber.
 {¶ 18} Upon reviewing the photographic arrays shown to Strunk and Jones, we are satisfied that the arrays and the procedure used in this case were not unduly suggestive. Exhibit 6 was the first array to include appellant's picture. While it shared pictures with two previous photographic arrays, it is not true that "before [a]ppellant's photo was added to the array, the very same array (with someone else's photo substituted for Appellant) had been previously shown to the witnesses." With the exception of one picture (not appellant's picture), the array consisted of pictures of white males in the same age group and with roughly similar builds and features.
 {¶ 19} Strunk and Jones were separately shown the array and both identified appellant as the robber. Neither witness was coaxed into selecting appellant's picture. There was nothing about the array or the procedure used by the detective in presenting it to the witnesses which encouraged either Strunk or Jones to identify appellant as the robber. In addition, both Strunk and Jones had the opportunity to view appellant as they were only a few feet away from appellant during the robberies. It is true that when they were shown exhibit 7, appellant's picture was the only one taken in an outdoor setting. We find, however, that this fact itself did not make the array unduly suggestive. By the time they were shown exhibit 7, both Strunk and Jones had already identified appellant as the robber. We therefore find that the trial court properly denied appellant's motion to suppress the photographic array identification.
 {¶ 20} Appellant also challenges his identification by Herlinger from the lineup. While working at the Futon store two doors down from the Eastgate Subway, Herlinger noticed a man walking past her store in the direction of the Eastgate Subway a few minutes before the Subway was robbed. This individual attracted Herlinger's attention because she thought he was a high school acquaintance. Herlinger was never shown photographic arrays, but was asked to come to the Clermont County Jail to view a lineup. When she arrived at the jail, appellant and his mother were in the waiting room. Upon recognizing appellant as the man who had walked past the Futon store, Herlinger immediately told the receptionist who she was. Soon after, Det. Lucas took Herlinger to another room. Herlinger testified that during the five minutes she was in the waiting room with appellant, there was no interaction between the two of them. While viewing the lineup, Herlinger asked that appellant and the five other persons turn to their right. Upon viewing the men's left profile, Herlinger identified appellant as the man who had walked past the store. Herlinger testified that she was not coaxed into selecting appellant.
 {¶ 21} "When a witness has been confronted with a suspect before trial, due process requires a court to suppress an identification of the suspect if the confrontation was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under all the circumstances." State v. Davis, 76 Ohio St.3d 107, 112, 1996-Ohio-414. "However, no due process violation will be found where an identification does not stem from an impermissibly suggestive confrontation, but is instead the result of observations at the time of the crime." Id.
 {¶ 22} Upon reviewing the record, we find that the encounter in the waiting room and the subsequent lineup were not so unnecessarily suggestive and conducive to irreparable mistaken identification that appellant was denied due process. Nothing in the record indicates that the government arranged the confrontation between Herlinger and appellant. Herlinger testified she noticed the man walking past her store because he looked like someone she knew. Upon viewing appellant's left profile at the lineup, she identified appellant as being the man she had seen. The independent origin of Herlinger's identification of appellant makes the inadvertent confrontation in the waiting room prior to the lineup not prejudicial to appellant. See United States v. Monroe
(C.A.6, 1987), 833 F.2d 95; United States v. Matlock (C.A.6, 1974),491 F.2d 504, certiorari denied (1974), 419 U.S. 864, 95 S.Ct. 119.
 {¶ 23} We therefore find that the trial court properly denied appellant's motion to suppress the lineup identification. Appellant's second assignment of error is overruled.
 {¶ 24} Assignment of Error No. 9:
 {¶ 25} "THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY OVERRULING HIS MOTION TO DISMISS THE COUNT INVOLVING THE ALLEGED ROBBERY OF THE HOSTESS STORE AFTER THE PROSECUTOR FAILED TO ASSERT IN OPENING STATEMENT THAT SUCH OFFENSE OCCURRED IN CLERMONT COUNTY, OHIO, IN VIOLATION OF APPELLANT'S RIGHT TO DUE PROCESS OF LAW UNDER THE 14TH AMENDMENT TO THE U.S. CONSTITUTION, AND ART. I. § 16 OF THE OHIO CONSTITUTION."
 {¶ 26} During his opening argument, the prosecutor stated that the evidence would show that appellant "hit the Hostess Thrift Store out in Miami Township on State Route 28 once on August 16th of 2000." Miami Township is in Clermont County. In addition, appellant concedes that "this Court has been confronted with a similar issue, and resolved it against the defense" in State v. Pumpelly (1991), 77 Ohio App.3d 470. Appellant's ninth assignment of error is accordingly overruled on the basis of Pumpelly and State v. Allen (Jan. 27, 1981), Belmont App. No. 80-B-9.
 {¶ 27} Assignment of Error No. 5:
 {¶ 28} "THE JUDGMENTS OF CONVICTION ARE CONTRARY TO LAW AND TO THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES IN THAT THERE WAS INSUFFICIENT EVIDENCE ADDUCED TO ESTABLISH EACH AND EVERY ELEMENT OF EACH OFFENSE BEYOND A REASONABLE DOUBT."
 {¶ 29} Assignment of Error No. 6:
 {¶ 30} "THE JUDGMENTS OF CONVICTION ARE CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 31} Assignment of Error No. 7:
 {¶ 32} "THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY DENYING HIS MOTIONS FOR JUDGMENT OF ACQUITTAL PURSUANT TO CRIM.R. 29."
 {¶ 33} Appellant argues that the evidence introduced at trial was insufficient to convict him and that his convictions were against the manifest weight of the evidence. At the heart of those arguments is appellant's claim that the state failed to show beyond a reasonable doubt that (1) the money in all three robberies was taken without the consent of the stores' respective owners, or in the alternative, by threat, (2) the firearm used in the robberies was operable, and (3) appellant was the perpetrator in all three robberies.
 {¶ 34} Under Crim.R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt. State v. Bridgeman
(1978), 55 Ohio St.2d 261, syllabus.
 {¶ 35} When reviewing the sufficiency of the evidence to support a criminal conviction, "[a]n appellate court's function * * * is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 36} In order for an appellate court to reverse a trial court's judgment on the basis that a verdict is against the manifest weight of the evidence, the appellate court must unanimously disagree with the fact finder's resolution of any conflicting testimony. State v. Thompkins,78 Ohio St.3d 380, 389, 1997-Ohio-52. Specifically, "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Id. at 387. In making this analysis, the reviewing court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and the weight to be given the evidence. State v. DeHass
(1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 37} Appellant first challenges his convictions for aggravated robbery on the ground that the state failed to show beyond a reasonable doubt that the money in all three robberies was taken without the consent of the stores' respective owners, or in the alternative, by threat.
 {¶ 38} Appellant was convicted of aggravated robbery in violation of R.C. 2911.01(A)(1), which states in relevant part that "[n]o person, in * * * committing a theft offense * * * shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it[.]" R.C. 2923.11(A) defines a "deadly weapon" as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." R.C. 2913.03(A) defines "theft" as follows: "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * (1) Without the consent of the owner or person authorized to give consent,; (2) Beyond the scope of the express or implied consent of the owner * * *; (3) By deception; (4) By threat; [or] (5) By intimidation."
 {¶ 39} In the case at bar, the trial court instructed the jury that the offense of theft is committed when a defendant knowingly obtains property without the consent of the owner or by threat. We agree with appellant that there was no testimony at trial that the money was taken without the owners' consent, and that as a result, the state failed to show beyond reasonable doubt that the money in all three robberies was taken without the consent of the stores' owners.
 {¶ 40} However, there was ample evidence that the money was taken by threat. Jarvis and Jones both testified at trial that they considered appellant's display of his gun as a threat. Jarvis testified that "It was like `this is here if you don't do what I tell you.'" Jones testified that upon seeing the gun, she became concerned for her safety as well as the safety of the two employees then working in the store. Strunk did not testify whether he viewed the gun as a threat. However, he testified that on his very first day at the Eastgate Subway, a man entered the store and handed him a robbery note before displaying his gun to Strunk. Upon seeing the robbery note and the gun, Strunk immediately went to the cash register and complied with the robber's request. Based upon the foregoing, we find that the evidence presented at trial established beyond a reasonable doubt that in all three robberies the money was taken by threat in violation of R.C. 2913.02(A)(4).
 {¶ 41} Appellant also challenges the guilty verdicts as to the firearm specifications on the ground that the state failed to establish beyond a reasonable doubt that the firearm displayed during all three robberies was operable.
 {¶ 42} R.C. 2929.14(D)(1)(a)(i) requires the imposition of a three-year additional prison term if it is found that the offender had a "firearm" while committing a felony. However, before the offender can receive an enhanced penalty pursuant to R.C. 2929.14(D)(1)(a)(i), the state must present evidence beyond a reasonable doubt that the firearm was operable at the time of the offense. R.C. 2923.11(B)(1); State v.Murphy (1990), 49 Ohio St.3d 206.
 {¶ 43} In proving the operability of a firearm, the state need not produce the gun or offer direct, empirical evidence that the gun is operable. Id. at 209. Rather, "a firearm penalty-enhancement specification can be proven beyond a reasonable doubt by circumstantial evidence. In determining whether an individual was in possession of a firearm and whether the firearm was operable * * *, the trier of fact may consider all relevant facts and circumstances surrounding the crime, which include any implicit threat made by the individual in control of the firearm." Thompkins, 78 Ohio St.3d at 385; see, also, R.C.2923.11(B)(2). Proof of the operability of the firearm can also be established "by the testimony of lay witnesses who were in a position to observe the instrument and the circumstances surrounding the crime."Murphy at syllabus.
 {¶ 44} In the case at bar, all three robbery victims testified that a gun was displayed briefly from beneath the tee shirt of appellant. Both Strunk and Jarvis described the gun as a semi-automatic gun with a black handle. Jones simply described the weapon as a gun tucked into appellant's waistband. "This brief display of the firearm under the circumstances can only be described as an implicit threat to coerce the victim[s] into complying with the aims of the perpetrator."State v. Gest (1995), 108 Ohio App.3d 248, 263 (finding that firearm was operable where offender stole car of pizza deliveryman by briefly displaying pistol from beneath his shirt). We find that from this brief act of displaying the firearm, the jury could infer operability of the weapon. Id. at 264; see, also, State v. Stewart (Mar. 25, 1988), Lucas App. No. L-87-194. We therefore find that the evidence presented at trial established beyond a reasonable doubt that in all three robberies, the firearm used was operable.
 {¶ 45} Finally, appellant challenges his convictions for aggravated robbery on the ground that the state failed to establish beyond a reasonable doubt that he was the perpetrator in all three robberies. Appellant contends that except for the uncertain testimony of the eyewitnesses, there was no evidence connecting him to the robberies as there were no fingerprints, no forensic evidence, and no confession on his part despite a lengthy interrogation.
 {¶ 46} At trial, all three robbery victims testified. Strunk testified that when the robber came in the Eastgate Subway, wearing an untucked tee shirt and a black knit hat pulled low over his eyebrows, Strunk recognized the man as someone who had been in the restaurant earlier that day. The man was wearing the same clothes as he had earlier that day. Although the robbery only lasted 30 to 45 seconds, Strunk testified that he had the opportunity to get a good look at the robber's face, especially since they were only about two feet apart. A few days after the robbery, while in a nearby neighborhood, Strunk noticed a man "look[ing] just dead-on" like the robber. Strunk and a friend observed the individual get into a 1994 purple Chevrolet Cavalier. Strunk and his friend followed the car to a nearby apartment complex where they lost track of the car. Strunk provided the police with the description and the license plate number of the car.
 {¶ 47} Eight days after the first robbery, the Eastgate Subway was robbed again. Jones was working when the robber, wearing an untucked tee shirt and a black winter hat, walked in. In the course of approaching the counter to take his order, Jones made eye contact with the man. Jones testified that she had the opportunity to clearly look at him when she handed the bag back, especially since they were only two feet apart. Strunk and Jones were subsequently shown several photographic arrays (without appellant's picture) but neither one identified the robber in those arrays.
 {¶ 48} During his investigation, Det. Lucas learned that the purple Chevrolet Cavalier was owned by a Clifford Rose, whose friends were Shane Davidson and appellant. Two photographic arrays, one with a picture of Rose and one with a picture of Davidson, were shown to Strunk and Jones. Again, neither one identified the robber in the two arrays. Frustrated, Strunk asked the detective when they would show him an array with the robber's picture. The detective replied they had. Strunk told him they had not. Eventually, upon realizing that appellant had been a passenger in the Cavalier, and not the driver, Det. Lucas showed Strunk and Jones an array with a picture of appellant. Both identified appellant as the robber. Strunk told the detective he was 90% certain but wanted to see a more recent picture of appellant. Jones told the detective she was 70% certain but wanted to see appellant in person. Both were subsequently shown another array with a more recent picture of appellant. Strunk positively identified appellant as the robber. Jones identified appellant but asked to see him in a lineup. Both Strunk and Jones positively identified appellant in the courtroom as the person who had robbed them.
 {¶ 49} Jarvis was working at the Hostess store when she noticed a man with a black knit hat pulled down over his ears in the store. Jarvis testified that when the man asked her which register was open, they were face to face, about three feet apart, and made eye contact. Upon walking around the man to get to the register, Jarvis looked down and noticed the man's hairless legs. Following the robbery, Jarvis was shown some photographic arrays. Jarvis testified she did not recognize the robber in the arrays. Detectives Lucas and Davis, however, testified that Jarvis did identify appellant in one of the arrays as the robber.
 {¶ 50} Jarvis, Jones, and Herlinger eventually viewed a lineup composed of appellant and five other men. Herlinger asked to see the men's left profile. Jones and Jarvis asked to have the lineup participants say "you know what to do." Jarvis also asked that they pull their pant legs up. All three women identified appellant as the robber. Likewise, at trial, all three women identified appellant in the courtroom as either the robber (Jones and Jarvis), or the man who had passed her store a few minutes before the second Eastgate Subway robbery (Herlinger). Strunk, Jarvis, Heringer, and Jones all testified they had no doubt that appellant was the perperator of the robberies.
 {¶ 51} Based upon the foregoing, we find that the evidence presented at trial established beyond a reasonable doubt that appellant was the perpetrator of all three robberies. In accordance with the standards of review articulated above, we find that appellant's convictions for aggravated robbery and firearm specification were supported by sufficient evidence and were not against the manifest weight of the evidence. Appellant's fifth, sixth, and seventh assignments of error are overruled.
 {¶ 52} Assignment of Error No. 3:
 {¶ 53} "THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT IN OVERRULING HIS MOTION TO SEVER THE COUNTS FOR TRIAL, IN VIOLATION OF APPELLANT'S RIGHT TO DUE PROCESS OF LAW UNDER THE 14TH AMENDMENT TO THE U.S. CONSTITUTION, AND ART. I. § 16 OF THE OHIO CONSTITUTION."
 {¶ 54} Appellant argues that it was error for the trial court to deny his motion to sever the three aggravated robbery counts where identification of the robber was the primary issue. Appellant contends that the joinder of the offenses "impermissibly encouraged the jury to `stack' evidence admissible with respect to one of the crimes with charges involving the others, without any evidence of a nexus between them, other than a superficial similarity, encouraging the jury to convict on charges in which the evidence against [a]ppellant was weaker * * *."
 {¶ 55} The decision on the issue of severance is left to the discretion of the trial court. Braxton v. Maxwell (1965),1 Ohio St.2d 134, 135. The law favors joinder of multiple offenses and such joinder is liberally permitted if the offenses are of the same or similar character. Crim.R. 8(A); State v. Schaim, 65 Ohio St.3d 51,1992-Ohio-31. In the case at bar, the charges against appellant involved similar instances of aggravated robbery. Therefore, we conclude that joinder was proper under Crim.R. 8(A). Where joinder is otherwise proper, Crim.R. 14 requires the accused to show that his rights will thereby be prejudiced.
 {¶ 56} The state may counter an accused's claim of prejudice from joinder of multiple offenses in one of two ways, namely, the "other acts" test, or the "joinder" test. State v. Franklin (1991), 62 Ohio St.3d 118,122, certiorari denied (1992), 504 U.S. 960, 112 S.Ct. 2315. The other acts test requires the state to show that evidence of one offense would have been admissible at the trial of another offense under the other acts portion of Evid.R. 404(B). Id. The joinder test merely requires the state to show that "the evidence of each of the crimes is simple and direct." Id. The accused is not prejudiced by joinder when there is simple and direct evidence for each crime, regardless of whether evidence of the other crimes is admissible under Evid.R. 404(B). Id. If the state can meet the joinder test, it need not meet the stricter requirements of the other acts test. Id.
 {¶ 57} We find that the joinder test is met in the instant case. Evidence of each crime was simple and distinct. As the trial court found, "although undoubtedly terrifying to the victims, the robberies were simple holdups, nothing more." Each of the counts involved separate incidents involving three different victims and occurring on three different dates, and the jury had the benefit of hearing all three victims separately describe the incidents. In addition, the trial court instructed the jury to consider each count and the evidence applicable to each count separately. It is presumed that the jury will obey the trial court's instructions. State v. Dunkins (1983), 10 Ohio App.3d 72, 73.
 {¶ 58} We therefore find that appellant was not prejudiced by the joinder of the offenses arising out of the aggravated robberies, and that the trial court did not abuse its discretion by denying appellant's motion to sever. Appellant's third assignment of error is overruled.
 {¶ 59} Assignment of Error No. 8:
 {¶ 60} "THE TRIAL COURT ERRED IN REFUSING TO PERMIT THE DEFENSE TO PRESENT EVIDENCE OF AN EXCULPATORY STATEMENT MADE TO POLICE BY APPELLANT WITHOUT REQUIRING APPELLANT TO TESTIFY."
 {¶ 61} During the defense portion of his trial, appellant sought to admit evidence, through Det. Lucas, of an exculpatory statement appellant had made to the detective. The statement was a self-serving explanation of appellant's whereabouts on August 14 and 22, 2000 and tended to exculpate appellant from involvement in the two Eastgate Subway robberies. The state opposed the admission of the statement, arguing that it was hearsay unless appellant testified. The trial court agreed with the state and denied appellant's motion to admit the statement into evidence. The statement was then proffered into evidence.
 {¶ 62} Evid.R. 801(C) defines hearsay as "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Appellant's exculpatory statement, his alibi for August 14 and 22, 2000, was clearly hearsay as it was offered to prove the truth of the matter asserted. "Coming as it did during the defense, * * * it borders on an attempt to introduce a self-serving affidavit during trial, which of course clearly is inadmissible under the circumstances. If appellant wanted the exculpatory material brought before the jury[,] he could not do so through the mouth of another, thereby obviating the possibility of cross-examination." State v. Gatewood (1984), 15 Ohio App.3d 14, 16.
 {¶ 63} Under Evid.R. 801(D), prior statements by a witness and admissions by a party-opponent are not hearsay even though the statements or admissions are offered for their truth and fall within the basic definition of hearsay. However, Evid.R. 801(D)(1) requires that the declarant testify at trial and be subject to cross-examination concerning the statement. Because appellant did not testify at trial, his exculpatory statement did not fall under Evid.R. 801(D)(1).
 {¶ 64} Evid.R. 801(D)(2), likewise, provides that an admission by a party-opponent is not hearsay if "the statement is offered against a party * * *." "While the term `admission' appears to imply that the out-of-court statement must be a confession or statement against interest, in actuality, any prior statement of a party is admissible providing it is offered against the party at trial." State v. Baker
(2000), 137 Ohio App.3d 628, 652, quoting Weissenberger's Ohio Evidence (1998) 367, Section 801.33. In the case at bar, the state did not attempt to introduce appellant's exculpatory statement, but in fact objected to its admission. Because appellant's exculpatory statement was offered for him and not against him, it did not fall under Evid.R. 801(D)(2).
 {¶ 65} Upon reviewing the numerous exceptions to the hearsay rule, we find that appellant's exculpatory statement does not fall under any of the exceptions. We therefore find that the trial court properly refused to allow appellant's exculpatory statement during the course of defense. Gatewood, 15 Ohio App.3d at 16. Appellant's eighth assignment of error is overruled.
 {¶ 66} Assignment of Error No. 1:
 {¶ 67} "THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT IN ENTERING JUDGMENTS OF CONVICTION AFTER A TRIAL IN WHICH THE PROSECUTOR COMMITTED MISCONDUCT CONSTITUTING A VIOLATION OF APPELLANT'S RIGHT TO DUE PROCESS OF LAW UNDER THE 14TH AMENDMENT TO THE U.S. CONSTITUTION, AND ART. I. § 16 OF THE OHIO CONSTITUTION."
 {¶ 68} Appellant argues that the prosecutor[1] engaged in misconduct during closing argument when he (1) suggested that all five eyewitnesses witnessed all three robberies, and (2) referred to the pretrial hearing on appellant's motion to suppress identification.
 {¶ 69} The test for prosecutorial misconduct is whether the remarks made by the prosecution were improper and, if so, whether they prejudicially affected substantial rights of the accused. State v. Smith
(1984), 14 Ohio St.3d 13, 14. Even if a prosecutor's statements during closing arguments are improper, reversal based upon those statements is warranted "only if [they] permeate the entire atmosphere of the trial."State v. Tumbleson (1995), 105 Ohio App.3d 693, 699. In examining the prosecutor's arguments for possible misconduct, we must review the argument as a whole, not in isolated parts, and we must examine the argument in relation to that of opposing counsel. State v. Kroger (Apr. 3, 2000), Clermont App. No. CA99-05-050.
 {¶ 70} We note that appellant did not object to any of the prosecutor's alleged improper comments, thus waiving all but plain error under Crim.R. 52(B). Plain error does not exist unless, but for the error, the outcome of the trial would have been different. Jenks,61 Ohio St.3d at 282. Notice of plain error is to be taken in exceptional circumstances and only to prevent a manifest miscarriage of justice. Id.
 {¶ 71} Appellant first argues that the prosecutor engaged in misconduct during closing argument when he suggested that all five eyewitnesses witnessed all three robberies. During closing argument, the prosecutor stated "Well, how about the five eyewitnesses to the events who each came in here into court yesterday and told you, without any hesitation whatsoever, * * * that that's the man that committed these offenses? Is that enough? I mean, all five of them come in and say `that's the guy.'" The prosecutor repeated that statement or a similar one a few more times throughout closing argument.
 {¶ 72} As noted under appellant's third assignment of error, evidence of each robbery was simple and distinct. Each of the counts against appellant involved separate incidents involving three different victims and occurring on three different dates, and the jury had the benefit of hearing all three victims separately describe the incidents. We agree with the state that the jury knew that the robberies were separately committed, and therefore, could not have construed the prosecutor's foregoing statements in the manner suggested by appellant. We therefore find that the foregoing statements did not amount to plain error.
 {¶ 73} Appellant also argues that the prosecutor engaged in misconduct during the rebuttal portion of his closing argument when he stated "[w]e had a prior hearing in this case wherein the issue of his identity was raised, and they identified him at that hearing; you heard that testimony." Appellant contends that "[d]efense counsel did inquire of witness Strunk about the hearing on March 20, at which Strunk admitted, at that hearing, he could NOT identify [a]ppellant as the perpetrator * * *. Whether or not the prosecutor mischaracterized the evidence with respect to whether the victim-witness did identify Appellant at the pre trial hearing on the motion to suppress, that evidence was not admissible in the trial on the merits."
 {¶ 74} We note at the outset that the eyewitness identification suppression hearing was not first introduced during closing argument, but rather was first referred to by defense counsel during his cross-examination of Strunk. Contrary to appellant's allegation, the prosecutor did not mischaracterize the evidence as to whether Strunk identified appellant during the suppression hearing. During that hearing, Strunk testified that a few days after the August 14, 2000 robbery, he was in the parking lot of a pizzeria when he noticed a man "that look[ed] like the guy who robbed [him], look[ed] dead on." At trial, during cross-examination, when asked whether he testified during the hearing that he could not state that the person seen in the parking lot of the pizzeria was the same person who had robbed him, Strunk replied "Yes." However, on redirect, Strunk testified that during that hearing, he "candidly indicated that he could not say for certain that the person" in the parking lot was in fact the same person that had robbed him. Strunk further testified that the person in the parking lot looked a lot like the robber, enough that he followed him to find out where he was going, and noted the license plate of the vehicle in which that person was riding.
 {¶ 75} It is a prosecutor's duty in closing argument to avoid efforts to obtain a conviction by going beyond the evidence that has been presented to the jury. Smith, 14 Ohio St.3d at 14. Therefore, references by a prosecutor during closing argument to material outside the record normally constitute error and may serve as the basis for reversal when the error is prejudicial to the defendant. State v. Smith (1998),130 Ohio App.3d 360, 370. On the other hand, a prosecutor's latitude in closing argument is wider on rebuttal where the prosecutor has room to respond to closing argument of defense counsel. State v. Houseman (June 29, 2000), Belmont App. No. 98 BA 4, 2000 Ohio App. LEXIS 3015, at *7.
 {¶ 76} The prosecutor's reference to the suppression hearing during the rebuttal portion of his closing argument was in direct response to defense counsel's closing argument during which defense counsel questioned and criticized the state's evidence as to each eyewitness identification. Defense counsel also stated that "You don't have any fingerprints, any DNA, any videos, any confessions * * *. What you do have is identification testimony. Identification testimony is very powerful, it's also very dangerous. * * * All the people that were — before they came here today, had been shown various photo arrays * * *. They all had seen my client, they had focused on him at prior time, they'd seen him in lineups, then come here and dramatically look around the room. * * * Looked around dramatically, then at my client. That's all been rehearsed, it's all been gone over in * * * prepping your client or prepping the witness for trial[.]"
 {¶ 77} On rebuttal, the prosecutor replied as follows: "I don't walk the witnesses through and say, `here he is.' I don't take them over to the jail and we look through the window and look at Woody Wilson and say, `that's the guy.' It doesn't happen. I'm not allowed to. We had a prior hearing in this case wherein the issue of his identity was raised, and they identified him at that hearing; you heard that testimony. So they saw him in that setting, but this is not me taking people by the hand and walking them up and showing them, `Is that the guy?' `Here's the guy that I'm going to ask you if he committed this crime.' It doesn't happen."
 {¶ 78} In light of all of the foregoing, and upon thoroughly reviewing both the prosecutor's and defense counsel's closing arguments and the prosecutor's rebuttal, we find that the prosecutor's single and brief reference on rebuttal to the suppression hearing did not amount to plain error. See Smith, 130 Ohio App.3d at 371. Appellant's first assignment of error is overruled.
 {¶ 79} Assignment of Error No. 4:
 {¶ 80} "THE TRIAL COURT ERRED IN IMPOSING A SENTENCE WHICH WAS EXCESSIVE UNDER OHIO LAW, AND IN VIOLATION OF APPELLANT'S RIGHT TO DUE PROCESS OF LAW UNDER THE 14TH AMENDMENT TO THE U.S. CONSTITUTION, AND ART. I. § 16 OF THE OHIO CONSTITUTION, AND IN HIS RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENTS UNDER THE EIGHTH AMENDMENT TO THE U.S. CONSTITUTION AND ART. I. § 9 (OR IS IT 14?) [sic] OF THE OHIO CONSTITUTION."
 {¶ 81} Appellant argues that the record does not support the trial court's decision to sentence him to consecutive prison terms. Appellant contends that his "draconian" sentence is "disproportionately severe when measured against the actual harm caused by th[e] crimes."
 {¶ 82} An appellate court may not disturb a sentence imposed unless it finds by clear and convincing evidence that the sentence is not supported by the record or is contrary to law. R.C. 2953.08(G)(1); Statev. Garcia (1998), 126 Ohio App.3d 485, 487. The record that a court considers when reviewing the imposition of a sentence includes (1) the presentence investigative report, (2) the trial court record in the case in which the sentence was imposed, and (3) any oral or written statements made to or by the court at the sentencing hearing at which the sentence was imposed. R.C. 2953.08(F)(1)-(3).
 {¶ 83} Appellant was convicted of three counts of aggravated robbery in violation of R.C. 2911.01(A)(1), felonies of the first degree. A conviction for a first-degree felony carries with it a mandatory three-to-ten-year-prison term. R.C. 2929.14(A)(1). In the case at bar, appellant was sentenced to three seven-year prison terms, a sentence which clearly falls within the mandated range and is neither the shortest nor the longest prison term available. Appellant does not challenge the trial court's decision to sentence him to more than the minimum prison term.
 {¶ 84} Appellant was also convicted of three firearm specifications in violation of R.C. 2941.145(A). R.C. 2929.14(D)(1)(a)(i) provides that if an offender convicted of a felony is also convicted of a firearm specification pursuant to R.C. 2941.145, the trial court must impose an additional three-year prison term for the firearm specification violation. In the case at bar, appellant was sentenced to three additional three-year prison terms for the firearm specifications, as required under R.C. 2929.14(D)(1)(a)(i).
 {¶ 85} Under R.C. 2929.14(E)(4), a trial court may impose consecutive terms of imprisonment if it makes three findings. First, the trial court must find that the consecutive sentences are necessary to protect the public from future crime or to punish the offender. R.C.2929.14(E)(4). Second, the trial court must find that the consecutive terms are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. Id. Third, the trial court must find that one of the factors listed in R.C.2929.14(E)(4)(a) through (c) applies. The trial court must state sufficient supporting reasons for the imposition of consecutive sentences. R.C. 2929.19(B)(2)(c); State v. Edmonson, 86 Ohio St.3d 324,326, 1999-Ohio-110. In its sentencing entry, the trial court made the required findings under R.C. 2929.14(E)(4), including under R.C.2929.14(E)(4)(b) [the harm caused by the defendant was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the defendant's conduct].
 {¶ 86} While R.C. 2929.14(E)(4) gives a trial court the option to impose consecutive sentences, R.C. 2929.14(E)(1) through (3) requires a trial court to impose consecutive sentences (1) when a firearm is used to commit the offense; (2) when the offender was an inmate at the time of the offense; or (3) when the offender either committed aggravated robbery in violation of R.C. 2911.01(B) or failed to comply with an order or signal of a police officer in violation of R.C. 2921.331. R.C.2929.14(E)(2) and (3) are clearly inapplicable to appellant (appellant was convicted of aggravated robbery in violation of R.C. 2911.01[A]). Also applicable to appellant, however, is R.C. 2929.14(E)(1) which states in relevant as follows:
 {¶ 87} "If a mandatory prison term is imposed upon an offender pursuant to [R.C. 2929.14(D)(1)(a)] for having a firearm on or about the offender's person or under the offender's control while committing a felony * * *, the offender shall serve the mandatory prison term consecutively to and prior to the prison term imposed for the underlying felony pursuant to division (A) * * * of this section or any section of the Revised Code and consecutively to any other prison term or mandatory prison term previously or subsequently imposed upon the offender."
 {¶ 88} R.C. 2929.14(E)(1) clearly mandates that the sentences for the firearm specification violations be served consecutively to the sentences imposed for the aggravated robberies. Unlike the situation where the trial court has the option to impose consecutive sentences, the trial court was required to impose the sentences consecutively by operation of the law once it imposed prison terms upon appellant for firearm specification violations.
 {¶ 89} As the First Appellate District aptly noted, "R.C.2929.19(B)(2)(c) states that the trial court shall make a finding and give its reasons `if it imposes consecutive sentences under Section2929.14,' making no distinction between optional and mandatory consecutive sentences. * * * [W]e refuse to construe R.C. 2929.19(B) to mandate the absurd result of invalidating a sentence imposed by operation of the law." State v. Clark, Hamilton App. No. C-010532, 2002-Ohio-3135, at ¶ 13. We agree and find that when a trial court is required to impose consecutive prison terms pursuant to R.C.2929.14(E)(1) through (3), it need not state supporting reasons for the imposition of such consecutive sentences.
 {¶ 90} In light of all of the foregoing, we find that the trial court's imposition of consecutive sentences for aggravated robberies and firearm specification violations was correct and as mandated by R.C.2929.14(E)(1), and therefore not contrary to law. Appellant's fourth assignment of error is overruled.
 {¶ 91} Judgment affirmed.
WALSH, P.J., and YOUNG, J., concur.
[1] Once again, we notice that the prosecuting attorney has been before this court in the past concerning allegations of prosecutorial misconduct. See, e.g., State v. Farwell, Clermont App. No. CA2001-03-041, 2002-Ohio-1912; State v. Kroger (Apr. 3, 2000), Clermont App. No. CA99-05-050; State v. Reynold (Feb. 16, 1999), Clermont App. No. CA98-01-006. We observe that the prosecutor continues to walk a thin line, and we caution him concerning his actions and similar conduct in the future.